



**FILED**

MAY 2 2005

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

# 05C 2602

| | |
|---|---|
| MARGARET K. HILL, TRUSTEE OF KELK ) | No. |
| IRREVOCABLE TRUST, On Behalf of ) | JUDGE HART |
| Herself and All Others Similarly Situated, ) | CLASS ACTION |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE NOLAN |
| vs. ) | |
| ) | |
| TRIBUNE COMPANY, DENNIS J. ) | |
| FITZSIMONS, DONALD C. GRENESKO ) | |
| and JACK FULLER, ) | |
| ) | |
| Defendants. ) | |
| ) | DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## SUMMARY AND OVERVIEW

1.      This is a securities class action on behalf of all purchasers of the publicly traded securities of Tribune Company ("Tribune" or the "Company") between January 24, 2002 and July 15, 2004 (the "Class Period"), against Tribune and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Tribune is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment. The publishing segment operates 11 daily newspapers, distributes entertainment listings and syndicated content, operates a 24-hour cable news channel and manages the Web sites of Tribune's daily newspapers and television stations, along with other branded sites targeting specific communities of interest. The broadcasting and entertainment segment consists of 26 television stations, one radio station, the Chicago Cubs and Tribune Entertainment, a company that develops and distributes first-run television programming. These segments operate primarily in the United States.

3.      Newspapers report their sales figures to the Audit Bureau of Circulations, which conducts its own review and tracks newspaper circulation. Many print advertising contracts, including those at issue here, contained incentives based upon circulation. The greater the circulation of the newspaper or periodical, the more the advertiser pays for its advertisements to appear in them. Defendants in this case intentionally overstated the circulation of several of its publications, including *Hoy* and *Newsday*, in order to fraudulently extract higher incentive payments from the paper's advertisers. Defendants created the perfect system to allow for this grotesque overstated circulation. The defendants had knowingly established extremely weak – if not purposeless – circulation controls which allowed for the circulation overstatements. Moreover, unlike other publishers, the Company did not even require that the "circulation managers certify" the

- 1 -

claimed circulation. These fraudulently inflated circulation numbers were reported to investors and the market on a regular basis and the ill-gotten gains from the scheme artificially inflated Tribune's financial results. As a result, defendants' scheme not only defrauded advertisers, but artificially inflated the value of Tribune's stock, thus defrauding investors as well.

4.     Defendants' house of cards began to topple in June 2004 when Tribune reported that two of its papers, *Newsday* and Spanish-language publication *Hoy*, had inflated circulation figures since 2001. (Also in June, Hollinger International, owner of the *The Chicago Sun Times*, admitted that its paper's circulation was overstated.) These announcements set off a wave of outrage and increased scrutiny throughout the publishing industry, with advertisers keen to ensure that they were not being similarly duped. Tribune also came under increased scrutiny with the Audit Bureau of Circulations, a non-profit, private entity charged with monitoring the accuracy of circulation numbers for publications nationwide.

5.     As a result of this increasing pressure, Tribune finally admitted on July 15, 2004 that its reported circulation numbers for *Hoy* and *Newsday* were overstated. Tribune eventually announced it was conducting an internal investigation and that it may refund to advertisers all amounts that they had been overcharged. In response to this announcement, Tribune's stock price fell to $41 at the close of business on July 15, 2004 and has never recovered. This decline, caused by defendants' false and misleading statements throughout the Class Period, caused investors untold losses.

6.     The true facts, which were concealed from the investing public during the Class Period, were as follows:

       (a)     since at least FY 2001, defendants were inflating the circulation of Tribune's *Hoy* and *Newsday* publications;

- 2 -

(b)      as a result of said inflation, the Company's financial results during the Class Period were artificially inflated (including revenue, EPS and accounts receivables) and the Company's liabilities were understated;

(c)      the Company's revenue and income was grossly overstated by millions of dollars;

(d)      defendants had knowingly established extremely weak – if not purposeless – circulation controls which allowed for the circulation overstatements. Moreover, unlike other publishers, the Company did not even require that the "circulation managers certify" the claimed circulation; and

(e)      as a result of (a)-(d) above, defendants' ability to continue to achieve future EPS and revenue growth would be severely threatened and would and did result in $95 million in costs, fines, refunds and investigation expenditures.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

8.      Venue is proper here pursuant to §27 of the 1934 Act. Acts and transactions giving rise to the violations of law complained of occurred here.

9.      The Company's principal executive offices are located at 435 North Michigan Avenue, Chicago, IL 60611, where the day-to-day operations of the Company are directed and managed.

## THE PARTIES

10.      Plaintiff Margaret K. Hill, Trustee of Kelk Irrevocable Trust, purchased Tribune securities during the Class Period at an artificially inflated price and was damaged thereby.

- 3 -

11.     Defendant Tribune is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment.

12.     Defendant Dennis J. FitzSimons ("FitzSimons") is Chairman, President and Chief Executive Officer of Tribune. During the Class Period, FitzSimons reaped $1.2 million in ill-gotten bonuses tied to the Company's advertising revenue.

13.     Defendant Donald C. Grenesko ("Grenesko") is Senior Vice President, Finance and Administration of Tribune. During the Class Period, Grenesko pocketed more than $3.3 million in ill-gotten insider trading proceeds.

14.     Defendant Jack Fuller ("Fuller") was President of Tribune Publishing Company. During the Class Period, Fuller pocketed more than $4.2 million in ill-gotten insider trading proceeds.

15.     The individuals named as defendants in ¶¶12-14, are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Tribune's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the press releases, alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were thus materially false and misleading.

-4-

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

16.     Defendants knew or recklessly disregarded that Tribune's publicly reported circulation figures for *Hoy* and *Newsday* were false and misleading and that Tribune was not entitled to many millions of dollars of revenue generated by those false circulation figures. The artificially inflated circulation figures were generated via inflated advertising revenue for which defendants are responsible for reimbursing the injured third parties. Verifying the accuracy of the sales claims would have been a relatively easy task since Tribune was entitled to revenue for every issue sold. And revenues received from third-party vendors would have matched precisely with the number of issues each vendor claimed to have sold.

17.     Defendants were responsible for verifying the accuracy of the circulation claims of *Hoy* and *Newsday*. Defendants had an incentive structure in which certain of Tribune's employees *received bonuses based upon the claimed but unverified circulation figures*. Defendants extracted millions in ill-gotten bonuses tied to the performance of the Company and its circulation figures which were later revealed to be overstated. Thus, rather than encouraging the circulation managers to root out any inaccuracies or fraud, defendants encouraged them to play along.

18.     Even with the complicity of the circulation managers, however, this scheme required the Individual Defendants' participation. As discussed above, even the most rudimentary audit would have disclosed that the revenue generated by the third-party vendors did not match the inflated circulation numbers they claimed. Thus, defendants' scheme required that they prevent even the most basic examination of the circulation numbers by internal or external accountants. In other words, defendants not only implemented an incentive system to encourage vendors and circulation managers to misrepresent circulation figures, they also shielded this system from even the most cursory scrutiny, which would have revealed it to be fraudulent.

- 5 -

19.     Each defendant is liable for (a) making false statements *or* (b) failing to disclose adverse facts known to him about Tribune. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Tribune publicly traded securities was a success, as it: (a) deceived the investing public regarding Tribune's prospects and business; (b) artificially inflated the prices of Tribune publicly traded securities; and (c) caused plaintiff and other members of the Class to purchase Tribune publicly traded securities at inflated prices.

## PRE-CLASS PERIOD STATEMENTS

20.     Prior to the Class Period, *Newsday* reported its circulation figures, in an October 25, 2001 release. The release stated:

> Newsday's circulation edged up in the six months ended September 30, both during the week and on Sunday, the newspaper said yesterday
>
> Sales of newspapers in general have been especially strong since the Sept. 11 terrorist attacks. Compared with its average daily circulation of 577,354 during the six-month period, Newsday said it sold more than 675,000 copies in the first few days after the attacks and continues to sell more than 590,000.
>
> The six-month average circulation figure represented a gain of 0.18 percent from the same period a year earlier. Sunday circulation totaled 675,619, up 0.14 percent.
>
> The newspaper said the gains, which are subject to audit the Audit Bureau of Circulations, mark the 13th consecutive increase in daily circulation and 11th straight increase in Sunday sales.
>
> Slightly more than half of Newsday's gains were in sales of its New York City edition. Newsday is a subsidiary of the Chicago-based Tribune Co.

21.     These false figures were alive and uncorrected at the beginning of the Class Period.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

22.     On January 24, 2002, the Company issued a press release entitled "Tribune Reports 2001 Fourth Quarter Earnings and Full Year Earnings." The press release stated in part:

> Tribune Company, one of the country's premier media companies, operating businesses in broadcasting, publishing and on the Internet, today reported diluted

earnings per share (EPS), before restructuring charges and non-operating items, of $.21 for the 2001 fourth quarter, compared with $.36 for the 2000 fourth quarter. For the full year 2001, on the same basis, Tribune reported diluted EPS of $.72, compared with $1.30 for 2000. Including restructuring charges and non-operating items, diluted EPS for the fourth quarter 2001 was $.32, compared with $.11 for the same period in 2000. Including restructuring charges, non-operating items and a loss in 2000 from discontinued operations, diluted EPS for the full year 2001 was $.28, compared with $.70 for 2000.

Cash earnings (defined as net income, before restructuring charges and non-operating items, plus amortization expense) were $134 million in the 2001 fourth quarter, down from $185 million during the same period last year. In the 2001 fourth quarter, cash EPS, excluding restructuring charges and non-operating items, was $.40, down from $.54 per share in the 2000 fourth quarter.

"The downturn in the economy and a difficult advertising environment made this a challenging year for us," said John W. Madigan, Tribune chairman and chief executive officer. "The tragic events of September 11 increased our newsgathering costs and tested our people. But I have never been more proud of the journalism delivered by our newspapers, television and radio stations, and by our Web sites-our journalists rose to the challenge, as they always do," added Madigan. "And our management team responded to the difficult revenue environment by swiftly implementing cost containment initiatives across all of our business units."

During the fourth quarter, Tribune incurred $6.9 million of restructuring charges. Full year 2001 restructuring charges totaled $152 million, which related to the voluntary retirement program and other workforce reductions.

"The impact of the cost saving measures announced in June 2001 began taking effect in the fourth quarter and will continue into 2002," said Dennis J. FitzSimons, Tribune president and chief operating officer. "Voluntary retirement programs, staff reductions and reduced compensation have allowed us to control costs while devoting more resources to serving our readers, viewers and listeners." For a clearer understanding of our continuing operations, we are providing pro forma results for Tribune's operating groups in addition to reporting actual results. The pro forma results exclude restructuring charges and non-operating items, and they have been adjusted to take out the impact of the additional week in 2000, and they include Times Mirror for a full year in 2000. In 2001, Tribune's fiscal year comprised 52 weeks, compared with 53 weeks in 2000, resulting in one less week in the fourth quarter of 2001. Discussion of reported results also exclude restructuring charges and non-operating items.

23.     On March 18, 2002, Tribune filed its Form 10-K for the year ended December 30, 2001. The Form 10-K represented that *Newsday* had average circulation of 577,000 daily and 676,000 Sunday for the six months ended September 30, 2001.

- 7 -

24. On April 19, 2002, the Company issued a press release entitled "Tribune Reports First Quarter Earnings." The press release stated in part:

Tribune Company, one of the country's premier media companies, operating businesses in publishing, broadcasting and on the Internet, today reported first quarter diluted earnings per share (EPS) of $.32, before restructuring charges, non-operating items and the cumulative effect of a change in accounting principle. These results are even with a pro forma $.32 per share for the 2001 first quarter. Strong cost controls, which reduced cash operating expenses by 5 percent, and lower interest expense, offset a 5 percent revenue shortfall. Pretax restructuring charges of $27.3 million, primarily related to recently completed staff reductions in publishing, were taken during the quarter. No further restructuring charges are anticipated in 2002.

"Tribune is well prepared for an economic recovery," said John Madigan, Tribune chairman and chief executive officer. "While we have reduced operating expenses, we remain committed to providing the highest quality journalism. *Right now, business is looking a little bit better and the gradual improvement we are seeing at both our newspapers and television stations gives us confidence that the advertising market is strengthening.*"

*"We have kept a tight reign on costs and continue looking for opportunities to grow our businesses," said Dennis FitzSimons, Tribune president and chief operating officer. "We've accomplished a great deal, as this quarter's results demonstrate. At our newspapers, the cost controls we put into place last year are paying off-we're showing increased operating cash flow margins despite lower revenues."*

25. On July 18, 2002, the Company issued a press release entitled "Tribune Reports Second Quarter Earnings." The press release stated in part:

Tribune Company, one of the country's premier media companies, operating businesses in publishing, broadcasting and on the Internet, today reported second quarter diluted earnings per share (EPS), before non-operating items in both years and restructuring charges in 2001, of $.52, compared with a pro forma $.39 per share for the 2001 second quarter. Including non-operating items in both years and the restructuring charges in 2001, diluted EPS was $.33 in the second quarter of 2002 compared to a pro forma $.36 and a reported $.21 in 2001.

"Although the economy remains uncertain, Tribune had a good second quarter, marked by revenue growth and lower cash expenses," said John Madigan, Tribune chairman and chief executive officer. "The cost control measures we put in place last year are having a solid impact on our cash flow, which continues to improve. Tribune is well-positioned for the second half of 2002."

*Dennis FitzSimons, Tribune president and chief operating officer said, "The performance of our operating groups was better during the final month of*

*the quarter. On a comparable basis, June advertising revenues were up 7 percent at our television stations, 1 percent at our newspapers, and 37 percent at our interactive businesses." He added, "As we move to the third quarter, we look to maintain the sequential improvement we have seen since the start of the year*."

26.     On October 17, 2002, the Company issued a press release entitled "Tribune Reports

Third Quarter Earnings." The press release stated in part:

> Tribune Company today reported third quarter diluted earnings per share (EPS) of $.46, before non-operating items in 2001 and 2002 and restructuring charges in 2001, compared with $.24 per share (adjusted for intangible amortization) in the 2001 third quarter. Including non-operating items in both years and restructuring charges in 2001, diluted EPS was $.71 in the third quarter of 2002 compared with an adjusted $.31 loss and a reported $.49 loss in 2001.
>
> "Overall, Tribune will deliver more than $1.45 billion in EBITDA this year, and free cash flow of about $650 million -- despite the difficult economic environment," said John Madigan, Tribune chairman and chief executive officer. "We've used that free cash flow to significantly reduce our debt and make capital investments necessary to sustain long-term growth."
>
> Dennis FitzSimons, Tribune president and chief operating officer, added, "This year's third quarter results are continued proof of the strength and resilience of our media businesses and the people who run them. We are making steady progress in recovering from the severe downturn in advertising, and EBITDA margins have improved significantly, due in large part to our continued focus on costs."

27.     On January 29, 2003, the Company issued a press release entitled "Tribune Reports

2002 Fourth Quarter and Full Year Earnings." The press release stated in part:

> Tribune Company today reported fourth quarter 2002 diluted earnings per share (EPS) of $.57, up 58 percent from fourth quarter 2001 EPS of $.36. These results exclude non-operating items in both 2002 and 2001 and restructuring charges in 2001. Including these items, diluted EPS was $.57 in the fourth quarter of 2002, up 21 percent from $.47 in 2001. All amounts for 2001 are adjusted for intangible amortization.
>
> For the full year 2002, Tribune reported diluted EPS of $1.87, an increase of 42 percent from $1.32 for 2001. These results exclude non-operating items and restructuring charges in both years and the cumulative effect of a change in accounting principle in 2002. Including these items, diluted EPS for the full year 2002 was $1.30, up 44 percent from $.90 in 2001. All amounts for 2001 are adjusted for intangible amortization.
>
> Earnings per share amounts that exclude non-operating items and restructuring charges are presented to aid in the analysis of the company's on-going

- 9 -

operations. Tables accompanying this release present a reconciliation of earnings per share including and excluding restructuring and non-operating items, for both the fourth quarters and full years 2002 and 2001.

"This was an outstanding year for our company," said John Madigan, Tribune's chairman. "Our people have proven once again that they are star performers. Through their efforts, we achieved record earnings per share for the fourth quarter and full year, and our businesses established real momentum heading into 2003."

Dennis FitzSimons, Tribune's president and chief executive officer, said, "Our results clearly demonstrate the strength and resiliency of our local mass media franchises. In difficult times, advertisers rely on media that deliver results. In addition, the dedication of our employees, including a strong focus on cost controls, enabled the company to grow EBITDA by 20 percent to $1.5 billion, generate free cash flow of $700 million and reduce debt by $650 million."

28.    On March 12, 2003, Tribune filed its Form 10-K for the year ended December 24,

2002.   The 10-K represented that *Newsday* had average paid circulation of 579,000 daily and

677,000 Sunday for the six months ended September 30, 2002.

29.    On April 16, 2003, the Company issued a press release entitled "Tribune Reports

2003 First Quarter Earnings." The press release stated in part:

Tribune Company today reported first quarter 2003 diluted earnings per share (EPS) of $.41 compared with a diluted loss per share of $.33 in the first quarter of 2002. The 2003 first quarter results included a net non-operating gain of $.02 per diluted share. In the 2002 first quarter, Tribune recorded a net non-operating loss of $.09 per diluted share, a restructuring charge of $.05 per diluted share and a one-time $.51 loss per diluted share for the cumulative effect of a change in accounting principle related to the initial application of the impairment provisions of FAS 142.

"Our first quarter results clearly demonstrate the strength of our local mass media franchises -- revenues and operating cash flow are both up," said Dennis FitzSimons, Tribune president and chief executive officer. "During this difficult time, with the war in Iraq dominating news coverage, more and more readers and viewers are turning to our newspapers, television stations and web sites for news and information they can trust."

30.    On July 17, 2003, the Company issued a press release entitled "Tribune Reports 2003

Second Quarter Earnings." The press release stated in part:

Tribune Company today reported second quarter 2003 diluted earnings per share (EPS) of $.67 compared with $.33 in the second quarter of 2002. The 2003 second

quarter results included a net non-operating gain of $.10 per diluted share while the 2002 second quarter results included a net non-operating loss of $.19 per diluted share.

Tribune presents earnings per share amounts on a generally accepted accounting principles ("GAAP") basis only. This differs from the pro forma earnings per share amounts supplied by broker analysts to databases such as First Call.

"Our second quarter results reflect solid momentum as we head into the second half of 2003," said Dennis FitzSimons, Tribune president and chief executive officer. "The advertising environment is slowly but steadily improving and Tribune's broadcasting and publishing groups are benefiting as a result."

31. On October 16, 2003, the Company issued a press release entitled "Tribune Reports 2003 Third Quarter Results." The press release stated in part:

Tribune Company today reported third quarter 2003 diluted earnings per share (EPS) of $.53 compared with $.71 in the third quarter of 2002. The 2003 and 2002 third quarter results included a net non-operating gain of $.05 per diluted share and $.25 per diluted share, respectively.

Tribune presents earnings per share amounts on a generally accepted accounting principles ("GAAP") basis only. This differs from the pro forma earnings per share amounts supplied by broker analysts to databases such as First Call.

"Despite a challenging advertising environment in the third quarter, Tribune achieved solid revenue growth in both our newspaper and television businesses," said Dennis FitzSimons, Tribune's President and CEO. "Tribune has generated more than $1.1 billion of operating cash flow year-to-date and is on track to reach $1.6 billion for the full year. In the fourth quarter, *we expect revenues to grow and expenses to be flat, setting the stage for a strong 2004.*"

### Third Quarter 2003 Results

**Consolidated**

Tribune's 2003 third quarter operating revenues increased 3.4 percent to $1.39 billion from $1.34 billion in the 2002 third quarter. Consolidated cash operating expenses increased $52 million, or 5.5 percent, in the third quarter of 2003 primarily due to: a lower pension credit; higher newsprint expenses; the impact of the KPLR-TV, St. Louis and KWBP-TV, Portland, Ore. acquisitions; and higher cash operating expenses for the Chicago Cubs. Operating cash flow was down 2.0 percent to $370 million, compared with $378 million in the third quarter of 2002. Tribune's operating profit decreased 2.5 percent to $314 million, compared with $322 million in 2002. Equity income was $1 million in the third quarter of 2003, compared with a loss of $28 million in the third quarter of 2002.

- 11 -

\*　　\*　　\*

**Additional Financial Details**

Corporate expenses for the 2003 third quarter decreased 10 percent to $12 million from $13 million in the third quarter of 2002 mainly due to lower management bonus expense.

Net interest expense for the 2003 third quarter decreased to $48 million, down 5 percent from $50 million in the third quarter 2002. The decrease was primarily due to a reduction in outstanding debt, including the LYONs redemption in June 2003. Debt at the end of the 2003 third quarter, excluding the PHONES, was just above $2.2 billion compared with $2.75 billion at the end of 2002.

The effective tax rate in the 2003 third quarter was 38.8 percent, compared with a rate of 36.5 percent in the third quarter of 2002. In the third quarter of 2002, the Company reduced its state income tax expense and liabilities by a total of $9 million, net of federal taxes, as a result of favorably resolving certain state income tax issues.

Capital expenditures were about $42 million in the third quarter of 2003.

### Outlook

*The Company anticipates that its fourth quarter diluted earnings per share will be within the range of current Wall Street analyst estimates. This assumes that the economy continues to rebound and non-operating items for the fourth quarter are not material. Fourth quarter 2003 consolidated operating expenses should be flat compared to 2002 due to lower expenses for management bonuses and broadcast rights amortization in 2003.*

32. On January 28, 2004, the Company issued a press release entitled "Tribune Reports

2003 Fourth Quarter and Full Year Results." The press release stated in part:

Tribune Company today reported fourth quarter 2003 diluted earnings per share (EPS) of $1.00 compared with $.57 in the fourth quarter of 2002. The 2003 fourth quarter results included a net non-operating gain of $.34 per diluted share. Non-operating items had no impact on 2002 fourth quarter diluted earnings per share.

For the full year 2003, Tribune reported diluted earnings per share of $2.61 compared with $1.30 in 2002. The 2003 full year results included a net non-operating gain of $.52 per diluted share. In 2002, Tribune recorded a net non-operating loss of $.02 per diluted share, a restructuring charge of $.05 per diluted share and a one-time $.50 loss per diluted share for the cumulative effect of a change in accounting principle related to the initial application of the impairment provisions of FAS 142.

Tribune presents earnings per share amounts on a generally accepted accounting principles ("GAAP") basis only. This differs from the pro forma earnings per share amounts supplied by broker analysts to databases such as First Call.

*"Our financial results reflect solid growth at Tribune's publishing and broadcast groups*," said Dennis FitzSimons, Tribune's Chairman, President and CEO. "We met our goal of increasing operating cash flow to $1.6 billion. Despite higher retirement plan costs, cash operating expenses were up just 3 percent, reflecting our intense *focus on cost containment. Looking to 2004, we'll continue to focus on top line revenue growth by meeting the changing needs of our readers, viewers and advertisers.*"

\*        \*        \*

**Equity Results**

Equity income was $6 million for the full year 2003, compared with a loss of $41 million in 2002. The full year 2002 losses included two one-time items related to CareerBuilder. In the first quarter of 2002, the Company recorded its $7.5 million share of a restructuring charge for CareerBuilder. In the third quarter, there was a one-time charge for Tribune's $18 million share of CareerBuilder's tax liability resulting from its conversion to a Limited Liability Company in September 2002. The full year 2003 also reflects the recognition of equity income from TV Food Network.

**Additional Financial Details**

Corporate expenses for the 2003 fourth quarter increased 25 percent to $16 million from $13 million in the fourth quarter of 2002 mainly due to higher compensation and benefits expense. Corporate expenses for the full year 2003, before restructuring charges, increased 16.6 percent to $53 million from $46 million in 2002.

Net interest expense for the 2003 fourth quarter decreased to $47 million, down 5.6 percent from $50 million in the fourth quarter 2002. For the full year 2003, net interest expense decreased 6.1 percent to $192 million, down from $204 million in 2002. The decrease was primarily due to a reduction in outstanding debt. Debt at year-end 2003, excluding the PHONES, was approximately $2.0 billion compared with $2.75 billion at the end of 2002.

The effective tax rate in the 2003 fourth quarter was 33.8 percent, compared with a rate of 29.4 percent in the fourth quarter of 2002. The effective tax rate for the full year 2003 was 37.0 percent, compared with a rate of 35.3 percent for the full year 2002. In both the fourth quarters and full years of 2003 and 2002, the Company reduced its income tax expense and liabilities as a result of favorably resolving certain state and federal income tax issues. The adjustment in 2003 was $25 million and was recorded in the fourth quarter. The 2002 adjustment was $35 million, of which $26 million was recorded in the fourth quarter.

- 13 -

Capital expenditures were about $90 million in the fourth quarter and $194 million for the full year 2003.

**2004 Full Year Outlook**

As stated at the December 2003 analyst conferences, the Company anticipates consolidated revenue growth of about 6 percent in 2004, including about 1 percent from new publications. Consolidated operating expenses should grow in the range of 5.5 percent due to higher expenses for retirement plans, medical, newsprint and the impact of new publications. Full year 2004 diluted earnings per share is expected to be within the range of current Wall Street analyst estimates. This projection assumes that non-operating items are not material in 2004.

33. In February 2004, lawsuits were filed alleging *Newsday* and *Hoy* had misstated circulation figures. Tribune's denials were so forceful and convincing that not only did Tribune's stock not decline in value but it actually increased. The Company's February 11, 2004 press release stated:

Newsday publisher Raymond Jansen issued the following statement today regarding lawsuit filed yesterday against the newspaper and the Spanish-language newspaper Hoy:

"The lawsuit filed yesterday against Newsday and Hoy is completely without merit.

The allegations contained in the lawsuit are false. The source of the allegations is disgruntled former employee who was a principal of a bankrupt distribution company that was an affiliate of Newsday, bought in 1998.

The allegations involve less than 1% of Newsday's total circulation, and less than 15% of Hoy's total circulation.

The Audit Bureau of Circulations conducts annual audits of Newsday and Hoy. The last one was done in 2003, and we are scheduled for another in 2004.

As the lawsuit is without merit and the allegations it contains false, we will not comment further at this time."

34. On February 23, 2004, Tribune issued a press release announcing the expansion of *Hoy* including the paper's circulation rates:

Hoy, the nation's fastest growing Spanish-language daily newspaper, will hit newsstands in the Los Angeles area on March 1. Hoy will publish four zoned editions providing local news and advertising specific to Hispanic consumers in Los Angeles, Orange County/Long Beach, San Gabriel/Inland Empire and San Fernando.

\*　　\*　　\*

Available Monday through Friday, Hoy sells for 25 cents. The single-copy, tabloid-sized paper can be purchases from more then 7,000 retail locations.

"With a retail buying power of $48 million, Los Angeles-area Hispanics are an attractive audience to marketers," said Mildred Diaz, Hoy general sales manager. "Hoy's ability to zone advertising to specific local communities presents a great opportunity for advertisers."

Hoy is the nation's fastest growing Spanish-language daily newspaper, with editions in New York, Chicago and Los Angeles (March 2004). In New York, Hoy's paid daily circulation is more than 94,000 and Sunday paid circulation is more than 35,000. In Chicago, Hoy's paid daily circulation is more than 18,000. Hoy is published by Tribune Company, one of the country's premier media companies, operating businesses in broadcasting, publishing and on the Internet. Tribune reaches more than 80 percent of U.S. households and is the only media company with television stations, newspapers and websites in the nation's top three markets. Visit www.holahoy.com for more information.

35.　　On February 27, 2004, Tribune filed its Form 10-K for the year ended December 28,

2003. In the 10-K, Tribune reported that *Newsday* had average paid circulation of 674,000 daily and

713,000 Sunday for the six months ended September 30, 2003. The 10-K also represented that *Hoy*

was the second largest Spanish language newspaper in the U.S.

36.　　On April 15, 2004, the Company issued a press release entitled "Tribune Reports

2004 First Quarter Results." The press release stated in part:

Tribune Company today reported first quarter 2004 diluted earnings per share (EPS) of $.35 compared with $.41 in the first quarter of 2003. The 2004 first quarter results included a net non-operating loss of $.05 per diluted share, while the 2003 first quarter results included a net non-operating gain of $.02 per diluted share.

Tribune presents earnings per share amounts on a generally accepted accounting principles ("GAAP") basis only. This differs from the pro forma earnings per share amounts supplied by broker analysts to databases such as First Call.

*"After a slow start in January, revenues improved month-over-month during the first quarter," said Dennis FitzSimons, Tribune's chairman, president and chief executive officer. "We saw strong growth in help wanted advertising and solid increases over last year in our television group. Cash operating expenses grew in line with our expectations this quarter, due in large part to the impact of higher benefit and newsprint costs this year."*

- 15 -

**First Quarter 2004 Results**

**Consolidated**

Tribune's 2004 first quarter operating revenues increased 3 percent to $1.33 billion from $1.29 billion in the 2003 first quarter. Consolidated cash operating expenses increased

$44 million, or 4.6 percent, in the first quarter of 2004 primarily due to higher benefit and newsprint expenses and the impact of the KPLR-TV, St. Louis and KWBP-TV, Portland, Ore., acquisitions in March of 2003. Operating cash flow was flat compared with the first quarter of 2003. Tribune's operating profit decreased 1 percent to $273 million, compared with $276 million in 2003.

**Publishing**

Publishing's first quarter operating revenues were $1 billion, up 3 percent from last year's first quarter. Publishing cash operating expenses rose by 5 percent. Publishing operating cash flow was $235 million, a 3 percent decrease from $243 million in the first quarter of 2003. Publishing operating profit decreased 4 percent to $190 million, down from $198 million in 2003.

\* \* \*

**2004 Full Year Outlook**

As previously stated, consolidated revenues for 2004 are expected to grow about 6 percent, including about 1 percent from new publications, and will continue to be affected by many factors, including changes in national and local economic conditions, consumer confidence, job creation and unemployment rates. Consolidated operating expenses are expected to increase about 5.5 percent in both the first and second halves of 2004 due to higher expenses for retirement and medical plans, newsprint and the impact of new publications. Equity income is projected to be somewhat higher than 2003. Interest expense is expected to decrease from 2003 due to a lower average debt level and the impact of the debt refinancing in the second quarter of 2004. The effective income tax rate for 2004 is expected to be approximately 39 percent.

37.     On June 7, 2004, *Bloomberg* published an article entitled "Tribune Co. Plans to Cut

Jobs as Newspaper Ad Sales Miss Target." The article stated in part:

Tribune Co., publisher of the Chicago Tribune and Los Angeles Times, said it will eliminate jobs and reduce spending *because advertising sales at the Times and some other papers are falling short of forecasts*.

Tribune will record $10 million to $15 million in expenses related to the job cuts in the second quarter, the company said in a statement distributed by PR Newswire. It didn't specify how many jobs will be eliminated.

Newspapers are selling fewer ads than expected for products such as home furnishings, electronic goods and autos, the statement said. Gains in other categories such as real estate advertising will help overall sales increase about 4 percent during 2004, the company said.

Apart from job cuts, the company plans to reduce costs by conserving newsprint and trimming expenses in all departments. Tribune spokesman Gary Weitman didn't immediately return a call seeking additional comment.

38. On very vague news of the Company's advertising sales slump, the Company's

shares continued their descent, from $48 per share, as rumors relating to poor performance began to

circulate regarding the Company, to $46 per share in the days that followed.

39. On June 17, 2004, *Newsday* issued a press release announcing that *Newsday* and *Hoy*

had overstated circulation rates:

Newsday announced today that it would reduce its reported September 2003 Publisher's Statement of Circulation of 579,729 daily and 671,819 Sunday by approximately 40,000 daily and by approximately 60,000 Sunday. In addition, Hoy will reduce its reported circulation during the same period of 92,604 daily and 33,198 on Sunday by approximately 15,000 and 4,000 respectively. Both newspapers also expect to make significantly smaller adjustments to their March 2004 circulation figures.

Newsday and Hoy have been cooperating with the Audit Bureau of Circulation (ABC) on audit of the newspapers' circulation figures since February. A Tribune Company audit determined that during portions of 2002 and 2003 some copies of Newsday that were distributed for free as part of a home delivery promotional campaign were improperly recorded as paid copies. In addition, some single copy sales could not be verified because of inadequate record-keeping by one of Newsday's outside distributors.

As a result of the audit, Newsday's vice president of circulation has been placed on administrative leave. Tribune Company's internal investigation of the circulation practices at Newsday and Hoy is ongoing.

"We take these matters very seriously," said Newsday's publisher Raymond Jansen. "Once these discrepancies were brought to our attention we moved quickly to correct the situation and are instituting new policies and procedures to prevent it from happening again."

40. On June 21, 2004, *Bloomberg* published an article entitled "Tribune to Review

Circulation Counts at All Papers." The article stated in part:

Tribune Co., the second-largest U.S. newspaper publisher, is reviewing how circulation is calculated at the Los Angeles Times and the rest of its newspapers after finding that Newsday and Hoy inflated sales figures.

The probe involves 14 newspapers, including the Baltimore Sun, Orlando Sentinel and Chicago Tribune, said Gary Weitman, a spokesman for Chicago-based Tribune. Tribune Vice President Thomas Caputo will head the investigation.

Tribune last week cut the circulation of New York's Newsday and Spanish-language Hoy, and placed a Newsday vice president on administrative leave after saying the publications overstated their 2002 and 2003 numbers. Advertisers demand lower rates and shareholders may sell Tribune's stock unless they are reassured circulation numbers are accurate, said investors including Craig Nedbalski of Victory Capital Management.

41. On June 23, 2004, *Bloomberg* published an article entitled "Tribune Circulation Executives Must Certify Figures." The article stated in part:

Tribune Co., which said last week that two of its newspapers inflated sales figures, will require circulation department heads to verify the accuracy of their numbers every quarter, Chief Executive Officer Dennis FitzSimons said.

The changes are effective at the end of the month, when the Chicago-based company's second quarter ends. Tribune said last week that circulations at its Newsday and Hoy papers in the New York area were inflated. The company now is reviewing circulation practices at all 14 of its newspapers, including the Los Angeles Times, Baltimore Sun and Chicago Tribune.

Advertisers may demand rebates and shareholders may sell the company's stock unless Tribune can ensure that its circulation figures are accurate, investors and analysts have said.

42. On this partial disclosure of circulation problems plaguing the Company's circulation/advertising, the Company's shares continued their decline to $45.84 per share.

43. On July 15, 2004, the Company issued a press release entitled "Tribune Reports 2004 Second Quarter Results." The release stated in part:

Tribune Company today reported second quarter 2004 diluted earnings per share (EPS) of $.29 compared with $.67 in the second quarter of 2003.

Publishing operating profit in the 2004 second quarter included two pretax charges: $17 million, or $.03 per diluted share, for the elimination of 375 positions and $35 million, or $.06 per diluted share, related to the anticipated settlement with advertisers regarding misstated circulation of Newsday and Hoy, New York. On

June 17th, the Company announced that both newspapers would be reducing their reported daily and Sunday circulation for both the twelve months ended September 2003 and the six months ended March 2004. Since that time, the ongoing internal investigation has identified additional misstatements for these periods, as well as misstatements that impact 2001 and 2002.

The 2004 second quarter results also included a net non-operating loss of $.24 per diluted share, which primarily relates to the early retirement of debt completed on March 29. The 2003 second quarter results included a net non-operating gain of $.10 per diluted share.

Tribune presents earnings per share amounts on a generally accepted accounting principles ("GAAP") basis only. This differs from the pro forma earnings per share amounts supplied by broker analysts to databases such as First Call.

"In the second quarter, we moved aggressively to address circulation misstatements at Newsday and Hoy, New York, where ethical lapses occurred that are unacceptable and wholly out of character with Tribune's history of business integrity," said Dennis FitzSimons, Tribune chairman, president and chief executive officer. "We also initiated expense reductions in the publishing group in the face of softening revenues at the Los Angeles Times. Results for the majority of our newspapers and our broadcasting group were good, and we have demonstrated our confidence in the future with accelerated stock repurchases," he added.

44.    Then, on July 15, 2004, *Bloomberg* published an article entitled "Tribune Profit Falls

on Circulation Errors." The article stated in part:

Tribune Co., the second-largest U.S. newspaper publisher, said second-quarter profit fell 58 percent as it set aside $35 million to compensate advertisers for inflating circulation. Dow Jones & Co. and E.W. Scripps Co. said profit rose on higher advertising sales.

Tribune said it found more circulation errors at its newspapers and had net income of $96.4 million, or 29 cents a share. Dow Jones, publisher of the Wall Street Journal, said profit rose 10 percent to $34 million, or 41 cents. Scripps, owner of cable-TV channels including the Food Network, said profit rose 34 percent to $86.4 million, or $1.05.

Tribune, which publishes the Chicago Tribune, pared jobs at the Los Angeles Times after advertising sales slowed at the paper. Many metropolitan papers have lagged publications in smaller towns as cities including New York and Los Angeles have unemployment rates higher than the national average. Dow Jones was helped by a rise in financial advertising at the Journal.

*    *    *

Circulation Woes

Tribune said today it will pay 6 cents a share related to a settlement with advertisers for overstating circulation at Newsday and Hoy. It also recorded a pretax cost of $17 million, or 3 cents a share, to cut 375 jobs.

*Tribune said it found errors in circulation at Newsday, on New York's Long Island, and Hoy, a Spanish-language daily, going back to 2001 and will provide cash or free ad space to advertisers. Tribune first disclosed inflated sales figures at the newspapers last month. That spurred the company to review circulation practices at all 14 of its papers, including the Los Angeles Times, Baltimore Sun and Chicago Tribune.*

Revenue rose 3.2 percent to $1.5 billion from $1.45 billion, helped by advertising gains at its newspapers and television stations, the company said. Tribune was forecast to earn 61 cents in a Thomson Financial survey of 18 analysts.

Tribune Results

Advertising at Tribune's newspapers, the company's biggest division, rose 4.9 percent to $818.2 million, the company said. Retail advertising increased 5 percent, while classified ads rose 6 percent, boosted by a 16 percent gain in help-wanted placements.

Unemployment in Los Angeles and Chicago has lingered above the national average this year. In May, the most recent Labor Department data available for large cities, the jobless rate held at 6.2 percent in Los Angeles and rose to 6.2 percent in Chicago from 6 percent in April. The U.S. unemployment rate was 5.6 percent in May.

Dow Jones, whose Wall Street Journal is the No. 2 U.S. newspaper by circulation after Gannett's USA Today, said profit rose on advertising gains at the Journal, Barron's and its community newspapers. Sales jumped 11 percent to $437.8 million.

45.     On this news, Tribune stock dropped $1.12 per share.

## POST-CLASS PERIOD DISCLOSURES

46.     On July 22, 2004, *Bloomberg* published an article entitled "Tribune's Newsday Is Sued Over Advertising Rates, NYT Reports." The article stated in part:

Tribune Co.'s Newsday has been sued by 50 car dealerships who say the Melville, New York-based newspaper charged them advertising rates that were tied to inflated circulation figures, the New York Times reported.

The dealerships are seeking $25 million in compensatory damages and $100 million in punitive damages, the Times said. They also accused Newsday of

- 20 -

charging them advertising rates much higher than those paid by Long Island's bigger dealerships, the newspaper said.

Tribune Co. said last month that its auditors determined Newsday's average circulation for the year ended in September was overstated by about 40,000 papers for weekdays and 60,000 for Sunday, the Times said.

47.    On July 28, 2004, *Bloomberg* published an article entitled "Newsday Reduces Guaranteed Circulation, N.Y. Daily News Reports." The article stated in part:

Tribune Co.'s Newsday lowered its guaranteed circulation numbers in a letter to advertisers and also pledged to begin cutting ad rates through the end of next year, beginning Aug. 30, the New York Daily News reported.

Newsday guaranteed a circulation of 525,000 daily and 575,000 on Sundays. That's a reduction of 55,000 daily and 100,000 Sunday, [from] the numbers the company had used before advertisers challenged them in court, the Daily News said.

Newsday said the revised numbers are "a reliable minimum circulation base," the Daily News reported.

48.    On September 10, 2004, *Bloomberg* published an article entitled "Tribune to Take $45-$60 Mln Charge on Circulation Cut." The article stated in part:

Tribune Co., the second-largest U.S. newspaper publisher, will take a third-quarter charge of as much as $60 million to cover advertiser claims after cutting its circulation figures for Newsday and Hoy a second time this year.

An internal investigation at the two New York-area newspapers found "poor documentation, record mismanagement and programs that deliberately violated" rules at Tribune and the Audit Bureau of Circulations, an industry group that tracks circulation, Chicago-based Tribune said in a statement.

Tribune, which had cut the two papers' circulation numbers in June when it first disclosed the misstatements, said it expects Newsday's reported weekday circulation to drop by about 11 percent to as low as 480,000 for the year ended Sept. 30, 2003. The pretax charge in the current period of $45 million to $60 million follows a second-quarter cost of $35 million as the company compensates advertisers who may have overpaid.

                              *    *    *

The third-quarter charge will reduce profit by 10 cents to 12 cents a share, Atorino said. Tribune was expected to report a third-quarter profit of 55 cents a share, according to the average estimate of 17 analysts polled by Thomson Financial.

Sliding Circulation

\*     \*     \*

Advertising rates for newspapers are based on circulation, with advertisers paying more to reach a larger based of readers. The third-quarter charge of $45 million to $60 million covers the cost of resolving the advertising impact of the misstatements, Tribune spokesman Gary Weitman said.

49.     On January 28, 2005, *Bloomberg* published an article entitled "Tribune 4th-Quarter

Profit Falls 36% as TV Sales Fall." The article stated in part:

Tribune Co., the second-largest U.S. newspaper publisher, said fourth-quarter profit declined 36 percent as advertising sales fell at its television stations.

Net income dropped to $216.8 million, or 67 cents a share, from $338.4 million, or $1, a  year earlier, the Chicago-based company said in a statement distributed by PR Newswire. Sales rose 1 percent to $1.48 billion from $1.47 billion.

***Tribune is trying to win back the trust of advertisers after admitting this summer that it had overstated circulation at its Newsday and Hoy newspapers in New York. The company recorded a pretax expense of $55 million in the third quarter to repay customers who may have overpaid for ad.***

\*     \*     \*

***"The year just ended was a challenging one for our company, and our financial results reflect the uneven advertising environment as well as the impact of circulation misstatements at Newsday and Hoy in New York," Chief Executive Dennis FitzSimons said in the statement.***

50.     The statements set forth in ¶¶22-36 and 39 above were materially false and

misleading because defendants had fraudulently inflated the publicly reported circulation figures for

*Hoy* and *Newsday*. As defendants later admitted, the *Hoy* and *Newsday* circulation figures that

defendants released to the public were overstated. By June 2004, the Company admitted that for

*Newsday* the daily circulation figures were overstated by 40,000 and the Sunday circulation figures

by 60,000. In addition to the false and misleading circulation figures, defendants' statements

regarding revenue and EPS set forth above were false and misleading because Tribune was receiving

money to which it was not entitled as a result of artificially inflating circulation figures. After

defendants' fraud was revealed, defendants were forced to refund $55 million in cash to *Hoy* and

*Newsday* advertisers that had been defrauded, as well as millions more in advertising credits. These monies represent income which was fraudulently obtained from advertisers. By including such income in its financial statements and announcements, defendants misled the investing public regarding Tribune's financial condition.

51.     The true facts, which were concealed from the investing public during the Class Period, were as follows:

(a)     since at least FY 2001, the defendants were inflating the circulation of Tribune's *Hoy* and *Newsday* publications;

(b)     as a result of said inflation, the Company's financial results during the Class Period were artificially inflated (including revenue, EPS and accounts receivables) and the Company's liabilities were understated;

(c)     the Company's revenue and income was grossly overstated by millions of dollars;

(d)     defendants had knowingly established extremely weak – if not purposeless – circulation controls which allowed for the circulation overstatements. Moreover, unlike other publishers, the Company did not even require that the "circulation managers certify" the claimed circulation; and

(e)     as a result of (a)-(d) above, defendants' ability to continue to achieve future EPS and revenue growth, would be severely threatened and would and did result in $95 million in costs, fines, refunds and investigation expenditures.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

52.     Solely with respect to plaintiff's claims brought under the 1934 Act and Rule 10b-5, plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

- 23 -

(a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in efficient markets;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    plaintiff and other members of the Class purchased Tribune publicly traded securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

53.    At all relevant times, the market for Tribune publicly traded securities was an efficient market for the following reasons, among others:

(a)    as a regulated issuer, Tribune filed periodic public reports with the SEC and the New York Stock Exchange;

(b)    Tribune regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(c)    Tribune's publicly traded securities were actively traded in an efficient market.

## NO SAFE HARBOR

54.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made, and many were representations about the Company's present status. To the

- 24 -

extent there were any forward-looking statements: (a) there were no meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (b) the particular speakers of such forward-looking statements knew that the particular statements were false or misleading, and/or the forward-looking statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

55.     Any purported warnings contained in the press releases and statements quoted herein were generic and unparticularized boilerplate statements of risks, and thus, lacked the meaningful cautionary language necessary to insulate any purportedly forward-looking statements.

## LOSS CAUSATION/ECONOMIC LOSS

56.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Tribune's stock price and operated as a fraud or deceit on Class Period purchasers of Tribune stock by misrepresenting the Company's circulation figures, financial results, business success and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting circulation numbers – one of the Company's most important metrics. Over at least four years, defendants improperly inflated Tribune's reported circulation and earnings. Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Tribune stock fell precipitously as the prior artificial inflation came out of Tribune's stock price. As a result of their purchases of Tribune stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

57.     By improperly reporting Tribune's circulation figures for *Newsday* and *Hoy* and the Company's financial results, the defendants presented a misleading picture of Tribune's business and

prospects. Thus, instead of truthfully disclosing during the Class Period that Tribune's business was not as healthy as represented, defendants caused Tribune to falsely report circulation and earnings.

58.     These false claims of earnings and circulation caused and maintained the artificial inflation in Tribune's stock price throughout the Class Period and until the truth was revealed to the market.

59.     Defendants' false and misleading statements had the intended effect and caused Tribune stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $52 per share.

60.     On June 17, 2004, defendants publicly disclosed that *Newsday* and *Hoy* had overstated circulation figures by hundreds of thousands of subscribers and that the VP of Circulation had been placed on leave. These public revelations indicated that there had been prior falsification of Tribune's financial results due to defendants' circulation manipulations, and that Tribune had failed to achieve the growth represented. As investors and the market became aware that Tribune's prior financial results had been falsified and learned of Tribune's actual business prospects, which had long been obfuscated by the scheme to inflate reported circulation and false statements, the prior artificial inflation came out of Tribune's stock price, damaging investors.

61.     As a direct result of defendants' admissions and the public revelations regarding the truth about Tribune's previously reported circulation and financial results and its actual business prospects going forward, Tribune's stock price plummeted 16%, on unusually high volume, falling from $48.74 in early June 2004 to $41 per share in late July 2004, a drop of $7 per share. This drop removed the inflation from Tribune's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about defendants' fraud and Tribune's business performance was revealed, the Company's stock price plummeted, the artificial

- 26 -

inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of up to $7 per share.

62.     The 16% decline in Tribune's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Tribune's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which Tribune's stock price fell 16% from $48.74 as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was down less than 3%. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Tribune's stock price and the subsequent significant decline in the value of Tribune's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the 1934 Act and
### Rule 10b-5 Against All Defendants

63.     Plaintiff incorporates ¶¶1-62 by reference.

64.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Tribune publicly traded securities during the Class Period.

66.     In addition to their false and misleading statements and omissions, defendants also violated the "abstain or disclose" rule by selling Tribune stock while in possession of material, adverse, non-public information.

67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tribune publicly traded securities. Plaintiff and the Class would not have purchased Tribune publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

68.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Tribune publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934
### Act Against All Defendants

69.     Plaintiff incorporates ¶¶1-68 by reference.

70.     The Individual Defendants acted as controlling persons of Tribune within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Tribune, and their ownership of Tribune stock, the Individual Defendants had the power and authority to cause Tribune to engage in the wrongful conduct complained of herein. Tribune

- 28 -

controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Tribune are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Tribune publicly traded securities on the open market during the Class Period (the "Class"). Excluded from the class are defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors, assigns and any entity in which they have a controlling interest.

72.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the court. Tribune had more than 317 million shares of stock outstanding, owned by hundreds if not thousands of persons.

73.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the prices of Tribune publicly traded securities were artificially inflated; and

- 29 -

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

74. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

75. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

76. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiff and the members of the class damages, including interest;

C. Awarding plaintiff reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 2, 2005          LASKY & RIFKIND, LTD.
                                         LEIGH LASKY

                                     LEIGH LASKY

- 30 -

351 W. Hubbard, Suite 406
Chicago, IL 60610
Telephone: 312/634-0057
312/634-0059 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

MURRAY, FRANK & SAILER LLP
ERIC J. BELFI
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: 212/682-1818
212/682-1892 (fax)

LAW OFFICES OF JAMES M. ORMAN
JAMES M. ORMAN
1845 Walnut Street, 14th Floor
Philadelphia, PA 19103
Telephone: 215/523-7800
215/523-9290 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Tribune Co..doc

## Certification

I, Margaret K. Hill, Trustee of Kelk Irrevocable Trust, do hereby certify that:

1. I have reviewed the complaint and have authorized its filing.

2. I purchased securities of Tribune Company, which are the subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to this certification, I have applied to serve or served as a representative party on behalf of a class in an action brought under the federal securities laws in the following actions.

5. During the Class Period, I engaged in the following transactions:

### Transaction Information

| Buy Or Sell | Trade Date | No. of Shares | Price Per Share |
|---|---|---|---|
| Buy | 10/10/03 | 97 | 47.69 |

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on 04 / 29 / 2005.    Signature _____